SDS INTERNATIONAL, Plaintiff,

v.

The UNITED STATES, Defendant,

and

CBD Training, Inc., Defendant–
Intervenor.

No. 00–610 C.

United States Court of Federal Claims.

Feb. 21, 2001.[1]

1. This opinion and order was issued under seal on January 29, 2001. Pursuant to ¶ 3 of the ordering language in the January 29, 2001 opinion and order, the parties were instructed to identify protected/privileged material subject to deletion. Only intervenor proposed redactions. Brackets identify where material has been deleted.

Barbara S. Kinosky, McLean, VA, for plaintiff. James S. Phillips and Francis E. Purcell, Jr., of counsel.

Mark L. Josephs, with whom were David W. Ogden, Assistant Attorney General, David M. Cohen, Director, Mark A. Melnick, Assistant Director, Civil Division, United States Department of Justice, Washington, DC, for defendant. Warren D. Leishman, Department of the Air Force, of counsel.

Michael A. Gordon, Rockville, MD, for defendant-intervenor. Fran Baskin, of counsel.

*OPINION AND ORDER*

HEWITT, Judge.

This is a post-award bid protest action brought by an unsuccessful offeror against the United States. Plaintiff, SDS International (plaintiff or SDS), protests the decision of defendant, Department of the Air Force (defendant or Air Force), to award a contract to CBD Training, Inc. (intervenor or CBD) for contract aircrew training (CAT) and courseware development (CWD) for F–117 airplanes. CBD is an intervenor in this proceeding. The matter is before the court on plaintiff's request that the court enjoin the performance of the contract by any offeror other than plaintiff. Plaintiff has moved for summary judgment. Defendant and intervenor have cross-moved for judgment on the administrative record and summary judgment, respectively.

Plaintiff argues that defendant's evaluations of plaintiff's and intervenor's technical proposals were inconsistent; that defendant's evaluations of plaintiff's and intervenor's past performance were unreasonable; that defendant improperly relied on an undisclosed manning estimate in evaluating plaintiff's and intervenor's technical proposals; and that defendant's price analysis was flawed. Defendant and intervenor contend that defendant's evaluations of plaintiff's and intervenor's past performance and technical proposals were reasonable; that there were no rigid internal estimates guiding the procurement; and that defendant's price analysis was reasonable as well.

Plaintiff has also moved for leave to supplement the administrative record. The court addresses that motion in section II below.

For the following reasons, the court denies the protest.

I. Background

On April 10, 2000, defendant issued Solicitation and Request for Proposal No. F44650–00–R0006 (RFP). Administrative Record (AR) at 1237. The RFP sought proposals for CAT and CWD in connection with the training of pilots for F–117 airplanes. Defendant's Statement of Facts (DSF) ¶ 1.[2] The statement of facts is disputed by any other party.

---

2. None of the statements taken from any party's

contract anticipated a two-month phase-in period, a one-year base period, and six one-year option periods. Plaintiff's Proposed Findings of Uncontroverted Fact (PPFUF) ¶ 7.

## A. Basis for Award

The RFP stated that each proposal for the F–117 contract would be evaluated under four factors: past performance, mission capability, risk, and price. AR at 1228. The RFP stated that the past performance and mission capability factors were of *"primary and equal* importance." AR at 1227 (emphasis in original). The risk factor was deemed less important than either past performance or mission capability. *Id.* Price was identified as the least important factor. *Id.* The RFP also stated that the "[a]ward will be made to the Contractor whose proposal is determined to be most advantageous (best value) to the Government," and that "[t]he Government will make a subjective evaluation to determine the offeror's technical approach and proposed price that represents the greatest value to the Government." *Id.* at 1227–28.

The RFP set out rating systems for each factor and subfactor (other than price) that defendant would consider in making the source selection determination. AR at 1228–31. Past performance was to be assigned one of the following ratings: Exceptional/High Confidence, Very Good/Significant Confidence, Satisfactory/Confidence, Neutral/Unknown Confidence, Marginal/Little Confidence, or Unsatisfactory/No Confidence. *Id.* at 1229. The RFP explained the meaning of each rating; for instance, the Exceptional/High Confidence rating was described as meaning that "essentially no doubt exists that the offeror will successfully perform the required effort," whereas Very Good/Significant Confidence was described as meaning that "little doubt exists that the offeror will successfully perform the required effort." *Id.*

The RFP broke Mission Capability into three subfactors, in descending order of importance: Personnel Qualifications and Management (PQM), Courseware Development Approach and Instructional Systems Devel-opment Management Plan (ISD), and Phase–In. AR at 1230. Each subfactor was to be assigned a rating of Blue/Exceptional, Green/Acceptable, Yellow/Marginal, or Red/Unacceptable. *Id.* at 1229. Blue/Exceptional was described as "[e]xceeds specified minimum performance or capability requirements in a way beneficial to the Air Force," while Green/Acceptable was described as "[m]eets specified minimum performance or capability requirements necessary for acceptable contract performance." *Id.* Risk was assessed for each subfactor, with a rating of High, Moderate, or Low. *Id.* at 1230–31. The RFP also stated that price proposals would be evaluated for "reasonableness," noting that "[p]roposed prices will be evaluated to determine if prices are unreasonably high or low in relation to the Government's independent cost estimate, the offeror's technical approach ... and other offerors' proposed prices received in response to the solicitation." *Id.* at 1231.

The RFP described the CAT requirements as follows: "The contractor shall conduct academic and training device instruction in support of formal course syllabi, training plans, event lesson plans, and Continuation Training (CT) to formal course students and permanent party aircrew to accomplish required event objectives and specific event tasks." Attachment to Defendant's Notice of Filing of Excerpt of Request for Proposal at 1. The RFP described the CWD requirements as follows: "Contractor personnel shall produce, update, and revise courseware to support academic and training device instruction, and flight phases of the training system covered under this contract." AR at 1279. The RFP did not include an estimate of the required staffing for CAT or CWD tasks.

## B. Proposals

Plaintiff, intervenor, and four other companies made proposals in response to the RFP. DSF ¶ 11. Plaintiff's technical proposal stated that plaintiff intended to cover CAT tasks by hiring four full-time instructors and one site manager who would spend 50% of his time on instruction. AR at 2341. Plaintiff also proposed four personnel for all CWD tasks. *Id.* Intervenor proposed "four in-

structors and a Site Manager" for CAT tasks, noting that the four instructors "will be utilized to perform all CAT duties as they do currently." *Id.* at 1501. In explanation of its proposed staffing, intervenor noted that its proposal provided "flexibility" and "capacity for unforeseeable situations and emergencies," distinguishing and rejecting as less desirable a hypothetical alternative proposal that would have "routinely" required the site manager to carry up to 50% of an instructor's workload. *Id.* Intervenor proposed six personnel for all CWD tasks. *Id.* Both plaintiff and intervenor anticipated that the instructors would also assist in CWD tasks. *Id.* at 1501, 2364. Both plaintiff and intervenor also included in their CWD proposals support for the Briefing Room Interactive (BRI) program. *Id.* at 1495, 2394. Under that program, both proposals contemplated that CWD personnel would provide programming support and graphic illustration to assist the briefing of pilots on specific flight missions. *Id.* at 1495, 2394–95.

Both plaintiff and intervenor included past performance information in their proposals. Plaintiff submitted three of its Contract Performance Assessment Reports (CPARs), assessments by contracting officers of plaintiff's work, along with descriptions of each contract. AR at 2291–93, 2300–09. Accompanying one of the CPARs was correspondence between plaintiff and the contracting officer regarding the fairness of the assessments in the CPAR. *Id.* at 2294–99. Plaintiff also submitted a description of a contract for which plaintiff did not at that time have a CPAR, and one description of a contract on which plaintiff had done subcontract work. *Id.* at 2310–13. Intervenor, a newly formed entity, did not submit any corporate past performance information, but it did cite the experience of its vice president, Perry Davis, who had served as Program Manager for Reflectone Training Systems, Inc. (Reflectone) before joining intervenor. *Id.* at 1471. Intervenor submitted three of Reflectone's CPARs that addressed contracts undertaken during Mr. Davis's tenure. *Id.* at 1476–81. Intervenor also described two other Reflectone contracts with which Mr. Davis had assisted. *Id.* at 1472–73.

## C. Evaluations

Defendant's source selection evaluation team (SSET) prepared evaluation worksheets evaluating each offeror's proposal and rating the proposals in each area, *see* AR at 2463–80, and the source selection authority (SSA) issued a Proposal Evaluation Report (attached to which were the evaluation worksheets), examining the proposals and explaining the ratings. AR at 2451–62. Plaintiff received an Acceptable rating under the PQM subfactor. *Id.* at 2478. The SSA noted that plaintiff had proposed "11 employees on site to accomplish 11.0 man-years of work" and that plaintiff's approach "reduces the flexibility to accommodate short notice changes while meeting peak demands." *Id.* at 2455–56. The SSA also found that "[i]f the [site manager] is required to dedicate at least 50% of his time in CAT and SME [subject matter expertise] work, this will reduce his ability to effectively manage the contract." *Id.* at 2456. Plaintiff also received an Acceptable rating under the ISD subfactor. *Id.* at 2479. The SSA stated that plaintiff's BRI proposal "does not show the interoperability and cross-flow of function between CBT [Computer–Based Training] and BRI." *Id.* The SSA also found that plaintiff was planning to use software titled Quest and Authorware in CWD work, and stated that the contract must be performed with "royalty free software." *Id.*

Plaintiff received a past performance rating of Satisfactory/Confidence. AR at 2478. The SSA referred to two of plaintiff's contracts as "recent and relevant" but noted problems in the performance of each contract. *Id.* at 2455. In regard to the Weapons School contract, the SSA stated that "there were difficulties noted in the CWD effort" and that "[s]pecial contractor emphasis and close government monitoring was required to overcome difficulties." *Id.* In regard to the Cockpit Resource Management (CRM) contracts, the SSA noted "[s]ome difficulty ... meeting the phase-in timeline on the previous ACC [Air Combat Command] CRM contracts." *Id.* The SSA concluded that there was *"some doubt"* that plaintiff would successfully perform the contract. *Id.* at 2455 (emphasis in original).

Intervenor received ratings of Exceptional for both the PQM and ISD subfactors. AR at 2466–67. The SSA, in her discussion of intervenor's proposal, found that intervenor's staffing was "capable of meeting peak demand while retaining the flexibility to accommodate short-notice changes." *Id.* at 2453. The SSA also noted that "[a]lthough the site manager will be qualified and used as a CAT instructor, the manning does not require any significant workload to be added to the normal Site Manager duties." *Id.* The SSET also rated intervenor's past performance as Exceptional/High Confidence. AR at 2466. The SSA's explanation of the past performance rating cited Mr. Davis's experience with Reflectone and finding that the three Reflectone contracts for which intervenor submitted CPARs were "evaluated as recent and relevant to this solicitation." *Id.* at 2453. The SSA detailed the favorable evaluations on the Reflectone contracts and concluded that "*no doubt* exists that the contractor will successfully perform the required effort." *Id.* at 2453 (emphasis in original).

Based on these ratings, the SSA awarded the contract to intervenor. AR at 2461–62. The SSA acknowledged that intervenor's proposal cost more than plaintiff's, but noted that intervenor received better ratings in other factors and that the solicitation listed price as the least important evaluation factor. *Id.* at 2461. The SSA felt that "the importance of providing the best training for the Air Force F–117/AT–38 Aircrew fully justifies expending the additional funds." *Id.* at 2461–62.

### D. Plaintiff's Protest

Plaintiff filed a protest with the General Accounting Office (GAO) on July 10, 2000. AR at 2571. Plaintiff argued that the SSA's evaluations of plaintiff's and intervenor's past performance were unreasonable, that the SSA's downgrading of plaintiff's ISD plan was unreasonable, that the SSA relied on an undisclosed manning estimate in evaluating the proposals, and that intervenor's price was unreasonable. *Id.* at 2592–2605. The contracting officer filed a response to the protest, the Air Force filed an Agency Report defending the award, and intervenor filed a separate response. *Id.* at 2615–43, 2650–57. Plaintiff filed a supplemental protest on August 25, 2000, complaining that defendant had unfairly credited intervenor with the experience of the incumbent personnel intervenor proposed to hire but had not done the same for plaintiff. *Id.* at 2644–47. The Air Force responded to the supplemental protest, noting that the differences between plaintiff's and intervenors' ratings were attributable to many factors unrelated to incumbent personnel. *Id.* at 2688–91. On September 29, 2000, GAO denied the protest, finding that the SSA's technical and past performance evaluation ratings were reasonable and that the price analysis was proper. *Id.* at 2695–2705. Plaintiff subsequently brought suit in this court on October 11, 2000. Complaint at 1. Plaintiff has moved for summary judgment, and defendant and intervenor have cross-moved for judgment on the administrative record and summary judgment, respectively.

### II. Motion to Supplement the Administrative Record

▮▮▮▮ Plaintiff has filed a motion requesting leave to supplement the administrative record. Plaintiff requests that selected pages from the administrative record in the case of *SDS International v. United States,* 48 Fed.Cl. 759 (2001), be added to the record in this case. Plaintiff's Motion for Leave to Incorporate Protected Material in CFC No. 609–C into the Record (Pl.Mot.Incorp.) at 1. A review of agency actions under the APA is "generally limited to the administrative record developed by the agency." *Marine Hydraulics Int'l v. United States,* 43 Fed.Cl. 664, 670 (1999). Supplementation of the administrative record is appropriate, however, when materials outside the record are necessary to "preserve a meaningful judicial review." *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 345, 350 (1997). Important considerations in deciding whether the record may be supplemented are "whether other materials were considered, or whether the record provides an adequate explanation to the protester or the court as to the basis of the agency action." *Id.* The question of agency discretion in determining relevance was addressed by the court in its initial order

in this matter, which directed that "all materials provided to and/or considered by and/or created by and/or relied on by" defendant be included in the administrative record. Order of October 13, 2000 at 1.

■ The 00–609 C case concerns a separate procurement for training and courseware development in connection with F–4 airplanes. *See* Pl. Mot. Incorp. at 1; Plaintiff's Motion for Summary Judgment (Pl. Mot.) at 21. Procurements are ordinarily conducted separately; nothing in the record of the F–117 procurement supports plaintiff's argument that the conclusions reached in the F–4 procurement bear on the reasonableness of the F–117 evaluations. GAO also considered the same suggestion that it view the evaluation in the F–4 procurement as bearing on the F–117 procurement. AR at 2699 n. 2. GAO found that the F–4 and F–117 procurements were "independent procurements conducted by different program offices, different evaluators, and SSAs, and involved unique programs." *Id.* Because the evaluations were conducted separately, the records of the F–4 evaluation are not relevant to the resolution of the protest of the F–117 award. The court's task in reviewing this case is to determine whether the decision in the F–117 procurement was supported by the administrative record of that decision.

■ Plaintiff has also moved to incorporate the Declaration of William G. Flood into the administrative record. Plaintiff's Reply to United States' and CBD's Oppositions to Plaintiff's Motion for Leave to Incorporate Protected Material in CFC No. 00–609 C into the Record at 3–4. Mr. Flood's declaration was created on December 5, 2000, and was therefore not furnished to GAO in the course of plaintiff's protest. Declaration of William G. Flood at 9. The declaration does not fall within the category of "the record of [a] previous administrative . . . proceeding[ ] relating to the procurement." General Order No. 38, Appendix I ¶ 17(u). Nor is the declaration within any other category of materials that are ordinarily included in the administrative record under General Order No. 38. The court declines to include in the administrative record a document based solely on

recollection and created after the fact without a showing, which plaintiff has not made here, of the failure of the record to provide "an adequate explanation . . . as to the basis of the agency action." *Cubic Applications,* 37 Fed.Cl. at 350.

Accordingly, plaintiff's Motion for Leave to Incorporate Protected Material in CFC No. 00–609 C is DENIED.

## III. Discussion

### A. Summary Judgment

Plaintiff requested a preliminary injunction. The parties have agreed to consolidate the request for an injunction with a final hearing on the merits in order to resolve this matter expeditiously, and have agreed that the merits of the case should be addressed through a summary judgment proceeding. Transcript of October 13, 2000 Status Conference (Conf. Tr.) at 5, 18.

Summary judgment is warranted when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Rules of the United States Court of Federal Claims (RCFC) 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact that might significantly affect the outcome of the litigation is material. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. When the case is before the court on cross-motions for summary judgment, each motion is evaluated under the same standard. *Cubic Defense Sys., Inc. v. United States,* 45 Fed. Cl. 450, 457 (1999). Intervenor has filed a motion for judgment on the administrative record, which is governed by the same rules as a motion for summary judgment. RCFC 56 .1(a); *see Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255, 1997 WL 177509 (Fed.Cir.1997). The question on a motion for judgment on the administrative record is "whether the record substantiates a preponderance of evidence to uphold the procurement decision." *Ellsworth Assocs., Inc. v. United States,* 45 Fed. Cl. 388, 393 (1999). It is appropriate to assess a procurement through summary judgment motions and motions for judgment on the administrative record "because the

issues are matters of contractual and regulatory interpretation." *Analytical & Research Tech., Inc. v. United States,* 39 Fed.Cl. 34, 43 (1997). Because plaintiff must show that it is likely to prevail on the merits to be granted injunctive relief, *see DSD Laboratories, Inc. v. United States,* 46 Fed.Cl. 467, 480 (2000), the court addresses the merits of the case first.

### B. Standard of Review

■ The court reviews defendant's source selection decision under the standard set out in the Administrative Procedure Act (APA), 5 U.S.C. § 706. 28 U.S.C. § 1491(b)(4). The APA directs a reviewing court to overturn agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or, alternatively, "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. §§ 706(2)(A),(C). The protestor must show, by a preponderance of the evidence, that the agency's actions were either without a reasonable basis or in violation of applicable procurement law. *GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 779 (1997). Plaintiff argues that defendant's action was unreasonable. Pl. Mot. at 17. Plaintiff also argues that the award decision was inconsistent with applicable regulations. *Id.* at 16.

■ In addition to showing that the agency's action was arbitrary or capricious or otherwise inconsistent with law, a plaintiff in a bid protest action must show that the action was prejudicial. *Data Gen. Corp. v. Johnson,* 78 F.3d 1556, 1562 (Fed.Cir.1996). To show prejudice, the protestor must demonstrate that there is a reasonable likelihood that, absent the arbitrary or capricious action or violation of law, it would have been awarded the contract. *Alfa Laval Separation, Inc. v. United States,* 175 F.3d 1365, 1367 (Fed. Cir.1999).

■ The agency is entitled to broad discretion in evaluating proposals in a "best value" procurement, such as the one at issue here. *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 725, 1987 WL 20532 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988). A court may not "substitute its judgment ... for that of the agency, but should intervene

only when it is clearly determined that the agency's determinations were irrational or unreasonable." *Baird Corp. v. United States,* 1 Cl.Ct. 662, 664 (1983). If defendant shows that there was a reasoned basis for its decision, the award must be upheld. *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *CRC Marine Servs., Inc. v. United States,* 41 Fed.Cl. 66, 83 (1998). Accordingly, the court reviews defendant's decision to determine whether there was a rational basis for its evaluation and whether the evaluation was consistent with applicable law. If the court finds error, the court then examines whether the error was prejudicial to plaintiff.

### C. Technical Proposals

#### 1. PQM Subfactor

■ The SSET assigned plaintiff a rating of Acceptable for the PQM subfactor of its technical proposal while rating the PQM subfactor of intervenor's technical proposal Exceptional. AR at 2466, 2478. Plaintiff argues that the discrepancy in ratings was unwarranted because the two proposals were extremely similar, and that the weaknesses identified in the evaluation of plaintiff's proposal were present in intervenor's proposal as well but were not identified as such. Pl. Mot. at 23. Specifically, plaintiff planned to use its site manager as a part-time instructor who would devote 50% of his time to instruction, and the SSA raised concerns about the site manager's ability "to effectively manage the contract." AR at 2456. Plaintiff also argues that the SSET's rating of intervenor's staffing proposal as Exceptional was unjustified given that intervenor proposed only four instructors, and that another offeror was downgraded for having only four instructors on its staff. AR at 2469.

The SSET criticized plaintiff's lack of flexibility and questioned plaintiff's ability to "accommodate short notice changes" in light of its total staffing of 11 to handle 11 man-years of work. AR at 2478. Intervenor's proposal, by contrast, included total staffing of 13, including six full time CWD personnel (whereas plaintiff proposed four). *Compare*

*id.* at 2369 (plaintiff's proposal, projecting total CWD manning of four) *with id.* at 1499, 1502 (intervenor's proposal, projected total CWD manning of six and overall manning of 13). Since both plaintiff and intervenor gave their four instructors CWD tasks as well as CAT instruction, it was reasonable for the SSET to find that it would be more difficult for plaintiff's instructors to handle their workload, and that intervenor's additional CWD staff would lighten the load (by lessening the amount of time the instructors would have to spend on CWD work) and provide additional flexibility. Both plaintiff and intervenor proposed to use the site manager as a part-time instructor, but intervenor's additional CWD staffing (and diminished need for instructors to do CWD work) meant that the site manager would be less likely to be called upon to do extensive CAT work. That plaintiff's proposal calls for the instructors to do both subject matter expertise (SME) work and other CWD tasks, while intervenor's proposal limits instructor involvement in CWD tasks to SME work, supports intervenor's argument and the SSET's finding that intervenor's proposal provides more flexibility than plaintiff's.[3] *Compare* AR at 2364 (plaintiff's proposal, stating that the instructors "will work closely with SDS Team ID/ET [Instructional Developer/Educational Technologist], GA [Graphic Artist] and CBT/BRI experts to ensure that the production and revision of materials that support academic and TD [training device] training are accomplished in a timely and technically compliant manner.") *with id.* at 1501 (intervenor's proposal, stating that "[s]ix personnel will be dedicated to performance of all CWD tasks other than the SME functions."). The court does not find anything unreasonable in the SSET's ratings.

Plaintiff also argues that the SSET was inconsistent in its evaluations of various offerors' staffing proposals. Pl. Mot. at 24. Specifically, plaintiff points out that the

SSET assigned a weakness to another offeror's proposal because the other offeror proposed a CAT staffing level of only four people, which did not account for "the periods where the workload will require up to 5 instructors for short periods of time." *Id.;* AR at 2452. Plaintiff argues that intervenor should have been assigned the same weakness. Pl. Mot. at 24. But the other offeror proposed a staffing level of four people *including* the site manager, whereas intervenor proposed four full-time instructors *plus* the site manager. *Compare* AR at 2031 (other offeror's proposal, including "Site Manager" among the four proposed instructors) *with id.* at 1500–01 (intervenor's proposal, planning to "retain the current instructor work force level, four instructors and a Site Manager"). The court notes that the role of the instructor in CAT tasks contemplated by intervenor's proposal is not entirely without ambiguity. Intervenor's proposal says within the space of a few paragraphs both that "four instructors and a Site Manager … is the correct approach" and that "[t]he four incumbent instructors will be utilized to perform all CAT duties as they do currently." AR at 1501. Viewing the proposal as a whole, however, the court finds that the SSET was not unreasonable in concluding that intervenor's proposal included the site manager in the CAT team when necessary.

Plaintiff asserts that it was improper for the SSET to assign a strength to intervenor's CWD staffing because "CBD's overstaffing provided no extra value to the government" and "[defendant's] disclosed workload estimates established that there were insufficient work requirements to justify hiring separate full-time personnel to perform the CBT and Word Processor/Illustrator positions." Plaintiff's Opposition to United States' and CBD's Cross–Motions for Summary Judgment and Reply to United States' and CBD's Oppositions to Plaintiff's Motion for Sum-

---

**3.** Plaintiff argues that the additional flexibility provided by intervenor's proposal is not, in fact, an advantage, because the RFP provided that the contract would be modified if its workload increased by more than ten percent. Transcript of December 19, 2000 Oral Argument (Oral Arg. Tr.) at 47. The court notes, however, that the SSA found that plaintiff's staffing proposal "re-

duces the flexibility to accommodate *short notice* changes while meeting peak demands." AR at 2455–56 (emphasis added). It appears that the SSA was concerned about plaintiff's ability to accommodate an increased workload in the short term, before a contract modification could be prepared, approved, and accomplished. The court finds nothing irrational in that judgment.

mary Judgment (Pl.Opp.) at 17–18. Likewise, plaintiff complains that it was unreasonable for the SSET to assign plaintiff a "weakness" for combining the positions of CBT and BRI programmer because, plaintiff alleges, the combined annual hourly work for the two positions was [ ] hours. Pl. Mot. at 26. Intervenor, however, found that the combined annual work for those two positions was in fact [ ] hours, and that the assessment of total hours represents approximately [ ]% of the actual workload. AR at 1499. Intervenor's proposal also stated that [ ]. *Id.* at 1500. The SSET, in assessing the proposals, has the discretion to credit intervenor's assessment of the workload over plaintiff's. *See Cube Corp. v. United States,* 46 Fed.Cl. 368, 386 (2000) ("[T]he determination of the relative desirability and technical adequacy of proposals is primarily a matter of agency discretion, which we will not disturb unless it is shown to be without a reasonable basis or inconsistent with the stated evaluation criteria."). Plaintiff essentially asks the court to substitute its judgment for that of the SSET on this point in order to find plaintiff's staffing plan reasonable and intervenor's unreasonable, a substitution of judgment which the court declines to make.

Plaintiff argues that it was error to assign intervenor a strength for providing academic scheduling in the event that an optional CLIN for FTU scheduling was not hired, since the option was in fact exercised. Pl. Mot. at 25. The evaluation noted, however, that there was a possibility that the CLIN could be canceled at some point in the future, and that intervenor's approach throughout the contract minimized the impact of such a cancellation. AR at 2466. The assignment of a strength therefore appears to have a rational basis.

Plaintiff also argues that the SSET improperly assigned intervenor a strength for paying its staff wages above the Department of Labor minimum, since plaintiff proposed to do the same thing. Pl. Mot. at 25–26. Plaintiff's proposal contemplated paying above minimum wage only after the initial contract period, however, whereas intervenor proposed wages that were above the minimum and that would take effect immediately.

AR at 1572, 2343. It was within the SSET's discretion to find that intervenor's approach to wages offered an advantage not found in plaintiff's proposal. *See Stanley Assocs., Inc.,* 1988 WL 228288, \*4 (Comp.Gen. Dec.22, 1988) (upholding agency discretion to determine that protestor's wage structure was "unrealistic and posed a significant risk").

### 2. ISD Subfactor

■ Plaintiff also argues that the SSET unreasonably gave plaintiff only an Acceptable rating for the ISD subfactor. Pl. Mot. at 26. In particular, plaintiff argues that the SSA assigned a weakness based on the erroneous assumption that plaintiff's software was not royalty free. Pl. Mot. at 26; *see* AR at 2479 (evaluation of plaintiff, finding a weakness in plaintiff's plan to use Quest and Authorware because Statement of Work (SOW) required offerors to "provide royalty-free software to support their program," AR at 1303). The court observes that plaintiff did, in fact, represent one aspect of its software to be royalty-free. It is not clear, however, whether plaintiff proposed to rely on other software that might not be royalty-free. *Compare* AR at 2392 (plaintiff's proposal, stating that "[w]e intend to use a royalty-free CBT authoring software") *with id.* at 2387 (plaintiff's proposal, stating that "SDS Team Training specialists will be experienced in … software development tools such as … Authorware … and Quest").

The court notes that defendant had stated in the RFP the possibility that it would make the award without conducting discussions. AR at 1226. Plaintiff therefore knew or should have known that it would not necessarily be afforded the opportunity to correct ambiguities in its proposal. To some extent, therefore, any damage done to plaintiff by the SSET's finding that plaintiff's software was not royalty-free was self-inflicted. Moreover, plaintiff was not prejudiced by the error, since it related to only one aspect of the ISD subfactor evaluation and need not, in the context of several other concerns expressed in the ISD evaluation, be viewed as determinative. The royalty-free software problem was only one of three weakness that defendant assigned to plaintiff under the ISD

subfactor. *Id.* at 2479. Eliminating that weakness would not necessarily have changed plaintiff's rating. Moreover, since intervenor was evaluated more favorably than defendant with respect to past performance and the PQM subfactor, as well as the ISD subfactor, the court finds that there was not a "substantial chance" that plaintiff would have been awarded the contract absent a possible minor error in the ISD subfactor evaluation. *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1582 (Fed.Cir.1996).

Plaintiff also argues that defendant unreasonably assigned a weakness based on plaintiff's provision for 95% response to contingency requirements, when the SOW required 100% response. Pl. Mot. at 26; AR at 2479. Plaintiff claims that its provision for a 95% response was a typographical error. Pl. Mot. at 26. Again, plaintiff was on notice that defendant might make an award without giving plaintiff an opportunity to revise its proposal. AR at 1226. Defendant is not required to revise its assessment of plaintiff to take into account plaintiff's errors in drafting its proposal. *See Elementar Americas, Inc.*, 1999 WL 510230, *2 (Comp.Gen. July 16, 1999) (upholding award based in part on finding that protestor did not meet requirement, even though protestor alleged that it did meet the requirement and that the portion of its proposal that said otherwise was a typographical error). Since defendant is entitled to take plaintiff's proposal at face value, it was not unreasonable for defendant to assign a weakness to plaintiff's apparent failure to meet a contract requirement.

Plaintiff argues that the typographical error represented the "one remaining weakness" in the ISD aspect of plaintiff's technical proposal. Pl. Mot. at 26. In fact, defendant also found that plaintiff's Educational Technologist was overtasked and assigned plaintiff a weakness on that basis, a weakness which plaintiff has not contested before this court. *See* AR at 2479. Even if defendant erred in assigning plaintiff a weakness for not providing royalty-free software, the SSA's decision was supported by several other considerations. The court therefore finds that plaintiff's Acceptable rating for the ISD subfactor was neither arbitrary nor capri-

cious nor without a rational basis. 5 U.S.C. § 706(2)(A).

### D. Past Performance

Plaintiff's past performance was rated Satisfactory/Confidence, while intervenor's past performance was rated Exceptional/High Confidence. AR at 2460. Intervenor's rating was two levels higher than plaintiff's, since the RFP also provided for a Very Good/Significant Confidence rating that fell between the Satisfactory/Confidence rating given to plaintiff and the Exceptional/High Confidence rating given to intervenor. *Id.* at 1229. Plaintiff argues that the SSET's past performance ratings for both intervenor and plaintiff were unreasonable and unwarranted. Pl. Mot. at 11–22.

#### 1. Intervenor's Past Performance

██ The SSET, in its worksheet for intervenor, noted that intervenor itself, as a new entity, had no corporate past performance. AR at 2466. The SSA's discussion of intervenor's past performance rating cited a Federal Acquisitions Regulation (FAR) provision which states that "[t]he evaluation should take into account past performance information regarding ... key personnel who have relevant experience ... when such information is relevant to the instant acquisition." 48 C.F.R. § 15.305(a)(2)(iii); AR at 2453. Plaintiff argues that Mr. Davis was not a "key person" in the performance of the contract, and that the SSET should therefore have regarded intervenor as having no past performance and given it a rating of Neutral/Unknown Confidence. Pl. Mot. at 15–17. Plaintiff cites as support for its position FAR § 15.305(a)(2)(iv), which provides that "[i]n the case of an offeror without a record of relevant past performance or for whom information on past performance is not available, the offeror may not be evaluated favorably or unfavorably on past performance." Pl. Mot. at 11; 48 C.F.R. § 15.305(a)(2)(iv).

The RFP stated that, in considering past performance, "the Government will consider relevant and recent past performance of key personnel." AR at 1264. The RFP also noted that "[k]ey personnel, including current employees and new hires proposed for

this contract[,] will be evaluated as part of past performance in accordance with FAR 15.305(a)(2)(iii)," and directed that "[i]dentification of key personnel for past performance should be included in the Past Performance Volume." *Id.* at 1267. Intervenor's proposal listed Mr. Davis under Key Personnel and described his experience with Reflectone and McDonnell Douglas Training Systems, Inc. *Id.* at 1471. Intervenor also described the contracts for which Mr. Davis served as Program Manager during his tenure with Reflectone. *Id.* at 1472–75. Intervenor proposed that Mr. Davis, as vice president, would directly oversee the site manager on the contract. *Id.* at 1471, 1503.

Plaintiff argues that, under intervenor's proposal, Mr. Davis did not play an important part in the contract, since he was not assigned to the location of the contract performance. Pl. Opp. at 9. Intervenor's proposal contemplated that Mr. Davis would be "responsible for the overall performance" of the contract and would "exercise[ ] management oversight of the site and monitor[ ] compliance with CBD's Quality Program Plan." AR at 1527. Intervenor's proposal also gave the site manager, Klaus Klause, a significant role, and noted that "with CBD Mr. Klause's responsibilities and authority can go far beyond those of the typical Site Manager" and that intervenor "would allow him to do his job without micro-management." *Id.* at 1472. But Mr. Klause's broad authority over the day-to-day operations of the contract does not make Mr. Davis irrelevant to intervenor's proposal. Intervenor cited "Mr. Klause's specific knowledge of this program coupled with Mr. Davis' broad experience with the USAF ISD model," suggesting that Mr. Davis's background was still relevant for the proposal notwithstanding Mr. Klause's experiences as the incumbent on the site and proposed broad authority. *Id.*

Whether a given manager is sufficiently "key" to be considered "key personnel" is a determination on which neither the FAR nor the RFP provides guidance. Absent a violation of a law or regulation, the court may overturn the SSA's determination that Mr. Davis can be considered "key personnel" only if that determination was arbitrary or capricious under the APA. Plaintiff asks the court to find that Mr. Davis did not have adequate supervisory authority over the contract to justify the importance assigned to him by the SSA. Pl. Opp. at 8–11. Plaintiff relies on *Olympus Bldg. Servs.*, 1999 WL 679687 (Comp.Gen. Aug.31, 1999), but that case does not support its argument. There, GAO denied a protest to an award in which the source selection authority elected not to consider the experience of key personnel and instead relied on the offeror's corporate history. 1999 WL 679687, at *2. GAO emphasized that the decision to consider the experience of key personnel is discretionary. *Id.* In this case, the court believes that the SSA's decision to consider Mr. Davis, the manager with final authority for contract performance, to be a "key person" was neither arbitrary nor capricious.

Plaintiff also suggests that the arbitrariness of the SSET's rating of intervenor's past performance is demonstrated by a comparison with another offeror. Pl. Mot. at 16–17; AR at 1647. The other offeror received a past performance rating of Neutral/Unknown Confidence. AR at 2463. Plaintiff argues that it was unreasonable for the SSA to rate the past performance proposal of the other offeror as Neutral/Unknown Confidence but to rate intervenor's past performance as Exceptional/High Confidence, since both offerors relied on the experience of key personnel. Pl. Mot. at 16–17. The SSA did not consider the performance of the other offeror's CEO sufficiently recent to be considered as past performance, since the CEO's only contract experience had come in 1994 and 1995. AR at 1648–49, 2463. The evaluation noted the RFP's definition of "recency" as "performance occurring within the last five (5) years." *Id.* at 1267. Mr. Davis's experience, however, was within the five years prior to the submission of intervenor's proposal, establishing a meaningful basis for distinguishing between intervenor's and the other offeror's proposals in their ratings for past performance. *Id.* at 1472–75.

The proposed contributions of Mr. Davis under intervenor's proposal in fact parallel the proposed contributions of plaintiff's per-

sonnel under its proposal. Plaintiff stated in its proposal that "all current employees indicate [that] they are interested in working for SDS should we be awarded this contract." AR at 2314. Plaintiff proposed to hire Mr. Klause and to give him broad authority over contract performance. *Id.* at 2346–47. Plaintiff's proposal states that its site manager "will be fully responsible for the performance of all work required by the SOW and the final ACC contract" and "will have the full authority to act for SDS on all contractual matters related to daily contract execution and will be the SPOC [Single Point of Contact] for all Government QAEs [Quality Assurance Evaluators]." *Id.* at 2347. Plaintiff's corporate level management was expected to "establish the broad operational policies for the program," provide equipment, and "interface with appropriate ACC officials on contractual issues." *Id.* at 2346. Plaintiff's officials were also expected to "remain abreast of program details and consult regularly on ways to improve training products and program execution," as well as hold "[s]pecial program reviews . . . in the event of a program deficiency or the emergence of issues requiring resolution." *Id.* Since plaintiff's corporate managers were the sole link between plaintiff's past performance and its proposal for this contract, and since their proposed role appears to be no greater than Mr. Davis's proposed role, it appears to the court that it was equally appropriate to consider Mr. Davis's experience as it was to consider the past performance of plaintiff's corporate managers. For both plaintiff and intervenor, it was necessary to consider the role of off-site management as part of contract performance if past performance was to be at all relevant, since both plaintiff and intervenor intended to hire incumbent on-site personnel.

▮ Plaintiff also argues that it was improper to attribute the strong performance of Reflectone to Mr. Davis for purposes of evaluating intervenor's past performance. Pl. Opp. at 6–8. Plaintiff cites *Beneco Enters., Inc.*, 2000 WL 1662990 (Comp.Gen. July 10, 2000), in which GAO sustained a protest of an award based in part on the experiences of one employee of the awardee (experience gained while working for the protestor). The

facts in that case, however, are significantly different from this one. The decision of the contracting officer that was overturned in *Beneco* was not simply the decision to attribute a company's performance to a particular employee. The contracting officer had given identical past performance ratings to the awardee and the protester, even though the awardee had submitted only one contract as a reference while the protester had submitted six contracts. *Id.* at *6. The propriety of the attribution of a positive rating for the company as a whole to one employee in a managerial position does not appear to the court to have been the focus of the *Beneco* decision.

GAO also noted other errors in the *Beneco* procurement process. Specifically, GAO criticized the government evaluator's reliance on the experience of the awardee's key personnel as inconsistent with the RFP. *Beneco*, 2000 WL 1662990, at *5. The RFP in *Beneco* requested only those awardees without corporate past performance to submit the references of key personnel, but the evaluator relied on the experience of the awardee's key personnel even though the awardee had corporate experience. *Id.* at *5. GAO also found that the contracting officer improperly relied on the awardee's unsupported statements about its personnel's experience. *Id.* at *6.

The court does not believe that it was improper in this case for defendant to consider Reflectone's positive corporate performance when weighing the experience of Mr. Davis. Intervenor's proposal stated that Mr. Davis had served as Program Manager for each of the Reflectone contracts submitted, and that he had borne "full responsibility for all aspects of the programs" in those contracts. AR at 1472. The SSET did not merely note on the evaluation worksheet that Reflectone had been rated favorably. Rather, it noted specifically that, on those contracts, "[e]xceptional performance was noted meeting the phase-in timeline." AR at 2453. It also pointed to "[e]xpertise . . . in working with the site QAEs to hire the most qualified and capable personnel." *Id.* It appears to the court that the SSET considered Mr. Davis's role in Reflectone's performance and concluded that he had contributed to that

755

strong performance, rather than mechanically imputing the performance of Reflectone to Mr. Davis. Evaluations of past performance are given substantial deference. *See Seattle Sec. Servs. v. United States*, 45 Fed.Cl. 560, 567 (2000). The court does not find unreasonable the SSET's reliance on Mr. Davis's experience with Reflectone in her evaluation of intervenor's past performance.

### 2. Plaintiff's Past Performance

Plaintiff also contends that defendant's decision to give plaintiff's past performance a Satisfactory/Confidence rating was unreasonable. Pl. Mot. at 17–22. The SSET considered three of plaintiff's past contracts, and found that there was *"some doubt"* that plaintiff would perform the F–117 contract successfully. AR at 2478 (emphasis in original). Plaintiff argues that the SSA's conclusion that plaintiff's past performance raised doubts about its ability to perform the F–117 contract was unwarranted. Pl. Opp. at 11–15.

In the Weapons School contract, one of the contracts submitted by plaintiff and considered recent and relevant by defendant, plaintiff was rated Marginal in one area, Satisfactory in five areas, Very Good in three areas and Exceptional in four areas. AR at 2300. Under the section of the CPAR labeled "Performance Evaluator/Program Manager Narrative" was the following text:

The Weapons School (WS) contract experienced "growing pains" during FY99. Numerous site visits were required to clarify the government's position with the contractor. Many scheduled deliverables were not up to the Weapons School standards requiring QAE correction and rework by the contractor. Initial quality of many deliverables was unacceptable. Government QAEs were providing editing support rather than ISD evaluation, courseware review, and approval. Due to the numerous re-work required, scheduled deliverables fell behind. However, SDS was able to catch-up with the delivery schedule after a contract modification was accomplished to give them credit for production process changes. The WS data base that was supposed to be delivered in Jul 99 has

still not been accepted by the Government. SDS has changed some key site personnel. Government QAEs have noticed improvement of the quality of the courseware deliverables.

*Id.* at 2301. Plaintiff wrote to the contracting officer, objecting to the evaluation and requesting that it be revised. *Id.* at 2294–98. Plaintiff argued in its letter that the problems identified were in fact attributable to other factors, such as changing government priorities and a greater than expected workload. *Id.* at 2295–96. The Air Force responded to plaintiff's letter, saying that "no change to the CPAR ratings was considered appropriate" but that "language has been added to Block 20 of the form that we hope alleviate [sic] your concerns." *Id.* at 2299. The Air Force also stated that "this form is applicable to the last performance period ending 30 September 1999" and that "[s]ince that time, we feel some additional improvements have been made and hope things continue in order to reflect these improvements on the CPAR for the current performance period." *Id.* The following language was added to the box on the CPAR labeled "Review by Reviewing Officer" and numbered 20:

In response to your letter dated 4 Jan 2000, the Government believes the overall assessment of your performance reflected in this CPAR is fair and accurate. It is true performance on contract aircrew training reflects high marks and the Government appreciates the excellent services for the instruction being given at the Weapons School. Courseware and database development services have had issues that have required more Government oversight than what is considered normal. For clarification on the database delivery referenced above, the database was initially delivered in accordance with the contract schedule. However, it has yet to be accepted due to the Government's delay in conducting a thorough evaluation and significant differences with SDS in interpreting the design and requirements documents. No changes to the CPAR are considered warranted.

*Id.* at 2301. Plaintiff submitted its letter to the contracting officer and the Air Force's response with its past performance proposal for the F–117 contract. *Id.* at 2294–98, 2300–01.

Plaintiff also submitted a CPAR for the ACC CRM contract and a description of the United States Air Force Europe (USAFE) CRM contract. AR at 2304–05, 2310–11. Plaintiff was employed as a subcontractor for Mei Technology, Inc. (Mei) on those contracts, and its primary role in CWD was providing subject matter experts. *Id.* at 2304, 2311. The CPAR given to Mei for the ACC CRM contract included three Very Good ratings and four Exceptional ratings. *Id.* at 2304. In the section of the CPAR labeled "Performance Evaluator/Program Manager Narrative," the contracting officer stated that "[b]ased on end of course survey feedback, the SDS contract instructors continue to be rated near superior." *Id.* at 2305. Plaintiff stated in its past performance proposal that no CPAR was available for its work on the USAFE CRM contract. *Id.* at 2310.

Defendant's evaluators gave plaintiff a rating of Satisfactory/Confidence for past performance, finding the Weapons School contract and the two CRM contracts recent and relevant. AR at 2478. In regard to the Weapons School contract, the SSET noted the difficulties in plaintiff's performance:

> The Weapons School was found to be recent and relevant to this contracted effort, the contractor performance was rated from marginal to exceptional. The instruction was rated as exceptional but there were difficulties noted in the CWD effort. Special contractor emphasis and close government monitoring was required to overcome difficulties.

*Id.* With regard to the CRM contracts, the SSET was concerned about "the limited scope of the CAT and the amount of involvement the contractor had in the CWD as a subcontractor," and found that "[s]ome difficulty was noted meeting the phase-in timeline on the previous ACC CRM contracts." *Id.* The SSET mentioned in addition that "[t]he CRM courseware met the requirements of the previous contracts and rated as 'Very Good' and 'Exceptional' on their Performance Assessment Reports." *Id.* Based on these findings, the SSET found that "there was *some doubt* the contractor would be able to successfully perform the required effort." *Id.* at 2478 (emphasis in original). The SSA adopted the SSET's findings and reached the same conclusion. *Id.* at 2455.

 Plaintiff argues that defendant's consideration of the Weapons School contract was "unreasonable and incomplete" and that defendant "knew that the negative comments . . . were unwarranted." Pl. Opp. at 12. However, an agency's evaluation of an offeror's past performance may draw on a "reasonable perception of inadequate prior performance." *PCT Serv., Inc.,* 1998 WL 938588, *3 (Comp.Gen. Dec.22, 1998). Even if the agency's interpretation of the facts giving rise to the perception of substandard prior performance is disputed by the contractor, the agency's evaluation will not be overturned as long as it is reasonable. *Birdwell Bros. Painting and Refinishing,* 2000 WL 1141260, *4 (Comp.Gen. July 5, 2000). *See also Pannesma Co.,* 1993 WL 126417, *4 (Comp.Gen. Apr.19, 1993) (upholding award when "there was sufficient evidence for the agency to conclude that the [protestor] had a series of performance problems under the prior contract").

 The record simply does not support plaintiff's claim that defendant "knew that the negative comments [about the Weapons School contract] were unwarranted." Pl. Opp. at 12. The record indicates that problems arose in the performance of that contract, and that plaintiff and defendant disagreed about who was responsible for those problems. The SSA did not find that either side was completely at fault or completely blameless; she noted that "there were difficulties noted in the CWD effort" and that special attention on both sides was necessary as a result. AR at 2455. Even assuming that the SSA did not know the precise extent of plaintiff's responsibility for the Weapons School contract problems, the court does not find it unreasonable for the SSA to conclude that those problems raised "some doubt" that plaintiff would perform the F–117 contract successfully. Moreover, the record also re-

flected the SSET's finding (unchallenged by plaintiff) of "[s]ome difficulty ... meeting the phase-in timeline on the previous ACC CRM contracts." AR at 2478.[4]

■ Plaintiff also argues that defendant "confined its evaluation to only one of [plaintiff's] contracts," the Weapons School contract. Pl. Opp. at 11. The record does not support that claim. The evaluation states that the ACC and USAFE CRM contracts, along with the Weapons School contract, were considered "recent and relevant" for purposes of the past performance evaluation. AR at 2478. The SSA did raise concerns over the "limited scope of the CAT" in the CRM contracts, but she did not "ignor[e]" them, as plaintiff argues. Pl. Opp. at 11. Moreover, an SSA may, "in evaluating past performance ... give more weight to one contract over another if it is more relevant to an offeror's future performance." *Forestry Surveys and Data v. United States,* 44 Fed. Cl. 493, 499 (1999).

■ Plaintiff submitted two other past performance references that the SSET apparently did not consider. *See* AR at 2306–09, 2312–13 (two descriptions of contract work, one with a CPAR). It is within the discretion of the procuring agency to find that some of plaintiff's past contracts are not relevant to the procurement at hand. *See Seattle Security,* 45 Fed.Cl. at 567 (" 'There is no requirement that all references listed in a proposal be checked.' ") (quoting *HLC Indus., Inc.,* 1996 WL 705198, *5 (Comp.Gen. Dec.6, 1996)); *Forestry Surveys,* 44 Fed.Cl. at 499 ("It is not only eminently reasonable, but is also within the sound discretion of the evaluators to weigh this contract more heavily in its evaluation than the other contracts listed."). Intervenor's past performance proposal was treated similarly, as defendant found only three out of intervenor's five references to be relevant. *Compare* AR at

1472–73 (intervenor's proposal, listing five different contracts on which Mr. Davis had worked) *with id.* at 2466 ("The VP of CBD has specific past performance in the following contracts: ACC UAV [Unmanned Aerial Vehicle], A/OA 10, and U2 CAT/CWD contracts.").

Finally, plaintiff asks the court to review its rating for past performance in the F–4 procurement, and, based on that review, to conclude that the evaluation in the present case was improper. Pl. Opp. at 15–16. The court has already found that the decisions in the two procurements were made separately. *See* section II *supra.* Even assuming that the contracts were similar, and assuming that both sets of evaluations were properly before the court, two sets of evaluators can reasonably reach different conclusions, as a number of persuasive GAO decisions have concluded. *See SRS Tech.,* 1996 WL 112422, *5 n. 4 (Comp.Gen. Mar.1, 1996) ("[T]here is nothing unusual or improper in different evaluators having different perceptions of the merit of a proposed approach, especially where, as here, the work involves different aspects of the program."); *Renic Corp., Gov't Sys. Div.,* 1992 WL 189192, *3 (Comp.Gen. July 29, 1992) ("[E]ach procurement stands alone, and a selection decision made under another procurement does not govern the selection under a different procurement."); *Centex Constr. Co.,* 1990 WL 278107, *4 (Comp.Gen. June 14, 1990) ("[W]e do not find it unusual or improper that different evaluators for different construction projects would have a different perception concerning Centex's quality control plan."). Based on a review of the record in this procurement, the court finds a reasonable basis for the SSA's evaluation of intervenor's past performance. The court is not persuaded that the reasonable basis for the SSA's determination in this procurement should be ignored because of a

---

4. Plaintiff also alleges that the contracting officer failed to consider evidence that mitigated the apparently negative performance on the Weapons School contract. Pl. Mot. at 20–21. The sole support in the record for this claim, however, consists of a statement in the brief that plaintiff submitted to GAO. Statements by counsel, standing alone, cannot create a genuine issue of material fact sufficient to defeat summary judg-

ment. *See Vivid Tech., Inc. v. American Science & Eng'g, Inc.,* 200 F.3d 795, 812 (Fed.Cir.1999) (" 'Factual assertions by counsel in motion papers, memoranda, briefs, or other such "self-serving" documents, are generally insufficient to establish the existence of a genuine issue of material fact at summary judgment.' ") (quoting *Nieves v. Univ. of Puerto Rico,* 7 F.3d 270, 276 n. 9 (1st Cir.1993)).

different evaluation of intervenor in a separate procurement.

### E. Undisclosed Manning Estimate

Plaintiff argues that the SSET used an undisclosed manning estimate in assessing the offerors' proposals. Pl. Mot. at 26–27. Plaintiff points to several GAO decisions holding that a contracting officer's reliance on undisclosed estimates is improper. *Id.* at 27. *See KCA Corp.,* 1994 WL 46644, *4 (Comp.Gen. Feb.9, 1994); *Allied Cleaning Servs., Inc.,* 1990 WL 269541, *2 (Comp.Gen. Feb.14, 1990); *Kinton, Inc.,* 1988 WL 224019, *3 (Comp.Gen. Feb.5, 1988). Plaintiff cites as evidence a chart included in the SSA's comparative analysis of the offerors which summarizes the ratings for each offeror. AR at 2460. The chart contains a line reading "Gov't Estimate" and setting "14" as the government's staffing estimate. *Id.*

GAO's decisions do not teach, however, that a contracting officer is required to disclose any and all estimates about possible proper approaches to a contract. Rather, the cases cited by plaintiff teach that mechanical reliance on such estimates rather than individualized evaluation of the various offerors' approaches to the problems is inappropriate. In *KCA,* GAO found that "absolute reliance on estimates can have the effect of arbitrarily and unfairly penalizing an innovative or unusually efficient offeror" and held that "it is inappropriate to determine the acceptability of proposals by the mechanical application of an undisclosed estimate." 1994 WL 46644, at *4. GAO's holdings in *Allied Cleaning* and *Kinton* are similar. In *Allied Cleaning,* the SSA "mechanically eliminat[ed] those offerors whose worksheets indicated that their [proposals] were comprised of man-hours which were not within 80 percent of the agency's estimate." 1990 WL 269541, at *2. GAO noted that the agency "made no effort to independently analyze the realism of the offerors' prices by determining the offerors' understanding of the solicitation requirements or assessing the validity of the offerors' technical approach." *Id.* Similarly, in *Kinton,* GAO found that "[t]he agency made no effort to independently analyze the realism of the offeror's proposed costs based on

each offeror's proposed personnel, staffhours and wage rates; rather, contracting officials simply applied each offeror's proposed wage rates to the agency's predetermined staffhour estimate." 1988 WL 224019, at *3. The existence of an undisclosed estimate is therefore not in itself improper.

Plaintiff has presented nothing to demonstrate that defendant here employed "absolute" or "mechanical" reliance on its staffing estimate, and the court cannot assume such reliance. Indeed, it is not possible that defendant used such a mechanical approach. Had defendant applied an estimate of 14 as an "absolute," defendant would have downgraded intervenor rather than rating the PQM subfactor of its technical proposal "exceptional." AR at 2460. The court finds that defendant did not use its staffing estimate to downgrade mechanically offerors who did not match that estimate.

Plaintiff also argues that defendant should have conducted discussions about the difference between plaintiff's staffing estimate and the government's estimate. Pl. Mot at 27. Plaintiff relies on *DynCorp,* 1994 WL 744848 (Comp.Gen. Dec.15, 1994), in which GAO held that when an agency relies on an undisclosed estimate, it should hold discussions with offerors "whose proposals substantially deviate from the estimate to learn the reasoning for the offeror's particular approach." *Id.* at *8. Whether a proposal deviates substantially from defendant's estimate is within defendant's discretion, however, and plaintiff has not given the court reason to believe that defendant abused its discretion here.

### F. Price Reasonableness

Plaintiff also argues that intervenor's proposal was not reasonably priced. Intervenor proposed total staffing of 13 at a price of $6.9 million, which plaintiff calls "unrealistic on its face" on the sole grounds that another offeror, MCA, proposed staffing of 11, plus two part-time personnel, at a price of $6.8 million. Pl. Mot. at 31, 32; AR at 2460. Plaintiff argues that intervenor could not provide nearly two additional personnel with a price increase of only $100,000. *Id.* at 31–32. The court believes that the more relevant comparison is to plaintiff's own propos-

al, which set staffing at 11 and cost $6.6 million. AR at 2460. Plaintiff has offered no evidence that intervenor's proposal to have two additional staff, at a cost of $300,000 more than plaintiff, was necessarily unreasonable. Whether the price estimate was reasonable is a discretionary determination regarding which this court will not substitute its judgment for the contracting officer's unless the officer's judgment was unreasonable. *See Biospherics, Inc. v. United States,* 48 Fed.Cl. 1, 9 (2000) (" 'The depth of an agency's price analysis is a matter within the sound exercise of the agency's discretion and we will not disturb such an analysis unless it lacks a reasonable basis.' ") (quoting *Ameriko–OMSERV,* 1994 WL 683264, *3 (Comp. Gen. Dec.5, 1994)). The court finds no error here.

III. Conclusion

The court finds that plaintiff's claims of prejudicial errors in the procurement process are not supported by the administrative record. Since plaintiff does not prevail on the merits, the court does not address plaintiff's request for injunctive relief.

For the foregoing reasons, plaintiff's motion for summary judgment is DENIED, and defendant's cross-motion for judgment on the administrative record and intervenor's cross-motion for summary judgment are GRANTED.

The court orders the following:

A. The Clerk of the Court is directed to enter judgment for defendant.

B. Each party shall bear its own costs.

C. All filings made under protective order in this matter shall remain under protective order for three years and 30 days after the entry of a judgment from which no appeal may be taken or after the expiration of any time for appeal after the entry of judgment, whichever first occurs. Notwithstanding the foregoing, upon motion of a party made within 10 days after the expiration of such three year period,

the court may order the continuance of the protective order.

IT IS SO ORDERED.